UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>THE PERSON OF ERIC WAYNE GRINDER;<br><br>A SONY PLAYSTATION 4, MODEL NUMBER CUH-1001A S/N: MB074707683; AND<br><br>A SENTRY 1160 SAFE, BEIGE IN COLOR | CASE NO. 18-2712-ADC<br><br>18-2713-ADC<br><br>___ FILED ___ ENTERED<br>___ LOGGED ___ RECEIVED<br><br>OCT 22 2018<br><br>AT BALTIMORE<br>CLERK, U.S. DISTRICT COURT<br>DISTRICT OF MARYLAND<br>BY ___ DEPUTY |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Richard P. Frederico, being duly sworn, depose and state that:

1. I am a Special Agent (SA) with the Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge, Frederick, Maryland Office and have been so employed since January 1998. As part of the daily duties as an HSI agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of Title 18, U.S.C. §§ 2251 and 2252A. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. I have also participated in the execution of search warrants that involved child exploitation and/or child pornography offenses.

2. I have received formal training from U.S. Customs and HSI and other agencies in the area of child pornography, pedophile behavior, collectors of other obscene material, and Internet crime. This includes, but is not limited to, production of child pornography in violation of 18 U.S.C. § 2251(a) and receipt and possession of child pornography in violation of 18 U.S.C.

1



§ 2252A(a)(2) & (5)(B) ("the TARGET OFFENSES").

3. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

## PURPOSE OF THIS AFFIDAVIT

4. This affidavit is being submitted for the limited purpose of establishing probable cause to support a search warrant authorizing agents:

   a. to view and photograph the hands of Eric Wayne Grinder. Grinder is currently in the custody of the Carroll County Detention Center. Grinder is more fully described in Attachment A-1;

   b. to search a SONY PLAYSTATION 4, Model Number CUH-1001A S/N: MB074707683, more fully described in Attachment A-2; and

   c. to search a SENTRY 1160 SAFE, BEIGE IN COLOR, more fully described in Attachment A-2 (together, the "TARGET LOCATIONS")

5. I am familiar with the information contained in this affidavit based upon the investigation I have conducted and based on my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography. The information contained in this affidavit came from my own participation in the inquiry described herein, as well as from other law enforcement officers and other third parties.

6. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. § 2251(a) (production of child pornography) and 18 U.S.C.



§ 2252A(a)(2) & (5)(B) (receipt and possession of child pornography) are located at the TARGET LOCATIONS further described in Attachment A-1 and A-2. The items to be seized are specified in Attachments B-1 and B-2, which is hereby incorporated by reference.

## SUMMARY CONCERNING CHILD PORNOGRAPHY AND PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY

7. Based on my investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the internet to view and receive images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals, including the following:

   a. Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

   b. Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

   c. Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

   d. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer, external hard drive and other memory device, or cellphone, and surrounding area. These collections are often maintained for several years and are



kept close by, usually at the collector's residence, or in online storage, email accounts or other online communication accounts, to enable the individual to view the collection, which is valued highly. These individuals also, occasionally, keep their collections at their office or place of work.

   e. Individuals who have a sexual interest in children sometimes keep portions of their collection in a digital or electronic format such as an external hard drive or other memory device and then secure that drive or memory device in a secure location such as a locked safe or in hidden locations within what appear to be typical household items.

   f. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

   g. Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

   h. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography. Consequently, individuals who have a sexual interest in children store their child pornography images in a variety of portable media—electronic and otherwise—and frequently maintain multiple computers and portable digital storage devices such as "thumb" or "flash" drives to store their collections.

  8. Based on my investigative experience related to computer and internet related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

   a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies.) The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To

4

distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

        b.      The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers, smartphones and the internet serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

        c.      Child pornographers can now transfer photographs from a camera onto a computer-readable format. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

        d.      Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

        e.      The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Collectors and distributors of child pornography use online resources to retrieve and store child pornography, including services offered by Internet Portals such as AOL Inc., Yahoo! and Google, Inc., Facebook, Dropbox, Instagram, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, file exchange services, messaging services, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Email accounts, online storage accounts, and other online communication accounts allow users to save significant amounts of data, including email, images, videos, and other files. The data is maintained on the servers of the providers, and is occasionally retained by the providers after the user deletes the data from their account.

        f.      In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

        g.      In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via

5



the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

   h. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

   i. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

   j. The storage capacity of personal computers has increased dramatically over the last few years. Common and commercially available hard drives are now capable of storing over 500 GB of data. With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

   k. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above described information will be recovered during forensic analysis.

## **LAWFUL AUTHORITY FOR PHOTOGRAPHS**

9. The Fifth Amendment protects from compelled disclosure only that evidence which is testimonial or communicative in nature. *Schmerber v. California*, 384 U.S. 757 (1966). In *Schmerber*, the Supreme Court observed that traditionally witnesses could be compelled, in both state and federal courts, to submit to "fingerprinting, *photographing*, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.* at 764 (emphasis added); *see also United States v. Euge*, 444 U.S. 707, 713 (1980).

10. The privilege does not protect or prohibit the introduction of information obtained through an examination or display of physical characteristics. *See, e.g., Holt v. United States*, 218

6

U.S. 245, 252-53 (1910) (the prohibition against self-incrimination is a prohibition against the use of compulsion to extort communication, not an exclusion of one's body as evidence when it may be material); *United States v. Hubbell*, 530 U.S. 27, 34-35 (2000) ("The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief.").

11. A suspect facing a court order to produce non-testimonial evidence has no constitutional right to refuse the order. *See In re Braughton*, 520 F.2d 765, 767 (9th Cir. 1975) (request for handwriting exemplar).

12. Moreover, regarding the Fourth Amendment, a defendant has no reasonable expectation of privacy in his physical characteristics where, as here, the defendant was arrested and detained based on a finding of probable cause to believe that he had committed the crime alleged in the Indictment. *See Jones v. Murray*, 962 F.2d 302, 304 (4th Cir. 1992) (noting that "persons lawfully arrested on probable cause and detained lose a right of privacy from routine searches of the cavities of their bodies" and concluding "as with fingerprinting, therefore, we find that the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken" for the purpose of identification).

## **PROBABLE CAUSE**

13. November 27, 2016, Makenna Riley Grinder (the "Minor Victim"), age 10, disclosed to her mother, Alesha Grinder ("Alesha"), that her adoptive father, Eric Wayne GRINDER, had been sexually abusing her.

14. On November 28, 2016, Alesha contacted the Carroll County Sheriff's Department to report the abuse. On November 29, 2016, the Minor Victim was interviewed by a Maryland State Police investigator and an investigator from Carroll County Child Protective Services (CC



CPS). During the interview, the Minor Victim advised that she lives with her mother and GRINDER and that the family had moved to their current house in Westminster, Maryland sometime during the summer of 2016 from their previous home in Abingdon, Maryland.

15. During her interview, the Minor Victim disclosed that GRINDER sexually abused her in both the family's current home in Westminster as well as their previous home in Abingdon. The Minor Victim estimated that the abuse began when she was age eight. The Minor Victim advised that she thought the last incident occurred in her current house in Westminster about a week prior to the interview.

16. The Minor Victim was identified various body parts on a girl to include, "thing," "butt," and, "boobs"—referring to the vagina, buttocks, and breasts, respectively. She also named various body parts on the boy to include, "thing," "butt," and, "boobs"—referring to the penis, buttocks, and chest, respectively.

17. Initially, the Minor Victim disclosed that her father abused her by touching her "thing" (vagina) with his hand. She first said he touched it over her clothes, but then advised he touched the skin of her "thing"—her vagina. She advised that this occurred both in her bedroom at her current house and at the family's previous house in Abingdon, Maryland—at least six times total. The Minor Victim then disclosed that her father touched her "thing" (vagina) with his "thing" (penis).

18. The Minor Victim disclosed to investigators that GRINDER's "thing" penetrated her "thing" slightly. Again, she advised that this conduct occurred in the residences in Abingdon and Westminster. The Minor Victim also disclosed that on one occasion her father pushed her mouth to his "thing" and put it in her mouth.

19. The Minor Victim advised that she has seen her mother and father taking what she

described as crushed-up pills. She also stated that that when the police officer came to the house the previous day she told the officer that her parents give her cough medication which she drinks at night and that the medication makes her sleepy.

20. Following the Minor Victim's interview, investigators interviewed Alesha. Alesha stated that had been married to GRINDER for two and a half years and that GRINDER adopted the Minor Victim shortly after they were married. Alesha further advised that she, GRINDER, and the Minor Victim lived at 122 Laurel Valley Court in Abingdon, Maryland for three years prior to moving to their residence located at 261 Montpelier Court in Westminster.

21. Alesha further advised that she has medical problems that cause her physical pain and, consequently, began taking non-FDA approved Clonazepam purchased by her husband over the Internet. Alesha also told investigators that on November 27, 2016, after the Minor Victim disclosed to her that her father had sexually abused her, she noticed the child to be extremely tired and barely responsive. Alesha retrieved a new, unopened bottle of Robitussin, opened it and tasted it. She then tasted the Robitussin from the bottle in the Minor Victim's bedroom that she assumed her husband had just given the child (the cup accompanying the bottle had fresh residue in it). Alesha stated that the "Robitussin" from the bottle in Minor Victim's bedroom tasted like the Clonazepam.

22. On November 29, 2016, at state search and seizure warrant was authorized for the Grinder residence located at 261 Montpelier Court in Westminster, Maryland for evidence relating to rape and sex abuse of a minor, among other crimes. The search warrant was authorized by Honorable Thomas F. Stansfield, of the Circuit Court for Carroll County. Among the items seized were the following: A Samsung Model SM-G900V Cellular telephone IMEI: 990004495000428; and a Toshiba Satellite laptop, Model number L505-ES5018, S/N: 1A112898Q.



23. The Samsung phone was seized from GRINDER, and Alesha stated that GRINDER owned and used the Toshiba laptop.

24. On December 2, 2016, the MSP investigator received a follow-up call from Alesha concerning additional statements by the Minor Victim concerning the abuse. Alesha reported that the Minor Victim told her that her father used his cell phone to videotape the Minor Victim performing oral sex on GRINDER, and then "put it on the TV."

25. On December 16, 2016, the Minor Victim received a Pediatric Sexual Assault Forensic Examination (SAFE Exam) at the Carroll Hospital Center, and the examining doctor noted indications of a history of sexual abuse, including the child's absence of her posterior hymen, which was diagnostic of prior penetrating trauma to the vagina.

26. On December 19, 2016, GRINDER's a forensic analyst at HSI in Frederick began an examination of the GRINDER's Toshiba Laptop. During the examination, the analyst discovered what he believed to be, based on the description of the child provided to him by investigators, an image of the Minor Victim—a minor female wearing glasses—performing fellatio on an adult male. He also discovered an image of the same child touching an adult male's penis.

27. In addition to suspected pornographic image of the Minor Victim, the analyst also discovered two known images of child pornography that he was familiar with based on his work in past child exploitation investigations.

28. After discovering the images of suspected child pornography, out of an abundance of caution, the analyst suspended his examination pending investigators obtaining a search warrant specifically authorizing a search of the devices for evidence relating to the production and possession of child pornography, and related offenses.

29. On March 16, 2017, the Minor Victim's aunt viewed a sanitized image of the suspected child pornography of the Minor Victim that the HSI analyst had located during his initial examination. The aunt confirmed that child in the image is the Minor Victim.

30. On March 17, 2017, federal law enforcement obtained warrants to search Defendant's residence at 261 Montpelier Court in Westminster, as well as the Toshiba laptop computer and the seized Samsung phone, for evidence relating to production and possession of child pornography.

31. After the federal search warrants for the Toshiba computer and the Samsung phone were obtained, the HSI analyst proceeded to exam them. The computer contained several images of the Minor Victim performing fellatio on adult male wearing blue sweat pants with a bright orange drawstring and an orange shirt. The face of the male is not visible. However, during the execution of the federal search warrants, law enforcement recovered, among other things, blue sweat pants with a bright orange drawstring and orange shirt—the exact outfit worn by the adult male in the images of the abuse.

32. The analyst's review of the Samsung phone (along with the SD card within it) likewise revealed images capturing the abuse of the Minor Victim.

33. The phone and its SD card contained three images of the Minor Victim's exposed genitals,[1] as well as videos depicting an adult male penetrating the Minor Victim's vagina with his finger and touching her vagina with a vibrator.

34. Furthermore, a search of the Samsung phone revealed the existence of PlayStation Messenger application. Based on my knowledge, training, and experience, I know that this

---

[1] I know the child in the depictions to be the Minor Victim because moles visible in the SAFE Exam photos of the Minor Victim are also visible in the depictions. So too is the Minor Victim's bedding, as identified by her aunt and mother.

application allows the user to, among other things, message gamer friends and talk about the games even while away from the PlayStation 4 system. The application also allows users to send text or voice messages as well as photos and stickers to gamer friends and or groups. I further know that users of the PlayStation Messenger application have the ability to send photographs to the PlayStation 4 system, which are then saved to the system's hard drive.

35. On March 25, 2017, when Grinder was detained at the Carroll County Detention in connection with state charges, he was visited by his sister, Kayla Martin. The visit was recorded. During the visit, Grinder asked his sister to retrieve his PlayStation from 261 Montpelier Court by breaking into it. She informed him that she already had the PlayStation in her possession. Grinder also told his sister that he needed her to go into 261 Montpelier Court and retrieve an item from behind a pillar in the kitchen that separated two kitchen cabinets and then "destroy, throw away, get rid" it. Martin responded, "Ok."

36. During the same visit, Martin advised Grinder that she "took the thing and hid it very, very good when Homeland Security came and then -- where's it at now, it's with me. Do you want me to keep that?" Grinder responds, "[t]hat has more, that has more not good stuff in it. And that's what you're retrieving from the house."

37. On April 5, 2017, Kayla Martin, was interviewed by law enforcement prior to her appearance before a Federal Grand Jury. In connection with her testimony, she provided law enforcement Grinder's PlayStation, which she had in her possession—a **Sony PlayStation (4), Model Number CUH-1001A S/N: MB074707683** and a **Sentry 1160 Safe, beige in color**, which belonged to Grinder. She further indicated that **Sentry 1160 Safe** was the "thing" that she had previously hidden from law enforcement and that she had told Grinder about during her visit. She likewise stated that she opened the safe and took pills from it, which she flushed down the toilet.

12

38.  On April 26, 2017, a federal Grand Jury sitting in the District of Maryland returned an Indictment charging Grinder with three counts of Production of Child Pornography, pursuant to 18 U.S.C. § 2251(a) and two counts of Possession of Child Pornography, pursuant to 18 U.S.C. § 2252(a)(4)(B).

39.  On May 4, 2017, Grinder has his initial appearance and arraignment on the Indictment and was ordered detained.

40.  On August 19, 2017, a federal Grand Jury sitting in the District of Maryland returned a Superseding Indictment charging the defendant with five counts of Production of Child Pornography, pursuant to 18 U.S.C. § 2251(a), two counts of Possession of Child Pornography, pursuant to 18 U.S.C. § 2252(a)(4)(B), and one count of Witness Tampering pursuant to 18 U.S.C. § 1512(b)(1).

## PROPOSED METHODOLOGY AS TO PHOTOGRAPHS

41.  HSI will utilize a digital camera, which will allow for immediate review of the images, and ensure that each photo was taken in focus. This will also limit the number of photographs taken. HSI intends to take photos of Grinder's right and left hands from various vantage points, including those corresponding with the vantage points depicted in the sexually explicit videos described above—*i.e.*, the videos depicting an adult male penetrating the Minor Victim's vagina with his finger and touching her vagina with a vibrator.

## CONCLUSION

42.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the aforementioned federal statutes have been violated and that there is probable cause to believe that evidence of the TARGET OFFENSES crimes can be found in the TARGET LOCATIONS.

43. WHEREFORE, I respectfully request that the attached warrants be issued authorizing the search and seizure of the TARGET LOCATIONS described in Attachments A-1, A-2 and the items described in Attachments B-1 and B-2.

_____
Richard P. Federico
Special Agent
Homeland Security Investigations

Sworn and subscribed before me
this  5th  day of October, 2018

_____
HONORABLE A. DAVID COPPERTHITE
UNITED STATES MAGISTRATE JUDGE



## **ATTACHMENT A-1**

DESCRIPTION LOCATION TO BE SEARCHED

The person of Eric Wayne Grinder, date of birth: X/XX/81; SSN: XXX-XX-1596 Grinder is currently in the custody of the Carroll County Detention Center.

1



## **ATTACHMENT A-2**

DESCRIPTION OF ITEMS TO BE SEARCHED

The following items currently in the custody of the HSI Law Enforcement Center 110 Airport Drive East, Frederick, Maryland 21701:

- **A SONY PLAYSTAION 4, Model Number CUH-1001A S/N: MB074707683;**
- **A SENTRY 1160 SAFE, BEIGE IN COLOR**

2



## ATTACHMENT B-1
## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

The left hand and right hand of the person described in Attachment A-1, which constitutes evidence of the commission of violations of Title 18, United States Code, Sections 2251(a) (production of child pornography), 2252A(a)(2) (receipt or distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography). During the course of the search, photographs of the left hand and right hand may be taken.



## ATTACHMENT B-2
### LIST OF ITEMS TO BE SEIZED AND SEARCHED

The items described in Attachment A-2 may be searched for the following items, which may be seized:

All records, documents, items, data and other information that may constitute fruits or instrumentalities of, or contain evidence related to the production of child pornography in violation of 18 U.S.C. § 2251(a) and receipt and possession of child pornography in violation of 18 U.S.C. § 2252A(a)(2) & (5)(B), including, but not limited to, the following:

1. Any and all notes, documents, records, or correspondence pertaining to child pornography as defined under Title 18, U.S.C. § 2256(8).

2. Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, U.S.C. § 2256(2).

3. Any and all records, documents, invoices and materials that concern any accounts, screen names, social networking sites, online accounts, or email accounts, including Internet Service Providers.

4. Any and all visual depictions of minors, to include depictions of minors engaged in sexually explicit conduct, nude pictures, and modeling.

5. Any and all documents, records, or correspondence pertaining to occupancy or other connection to 261 Montpelier Court, Westminster, Maryland 21157.

6. Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with minors.

7. Any and all notes, documents, records, photos or correspondence that indicate a sexual interest in children, including, but not limited to:

    a. Correspondence with children;
    b. Any and all visual depictions of minors;
    c. Internet browsing history;
    d. Books, logs, emails, chats, diaries and other documents.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical,



electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

        8.     For any computer, cell phone, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

        a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.     evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c.     evidence of the lack of such malicious software;

        d.     evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

        e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

        f.     evidence of the times the COMPUTER was used;

        g.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

        h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

        i.     contextual information necessary to understand the evidence described in this attachment; and

        j.     image and video files that depict children engaged in sexually explicit conduct pursuant to Title 18 U.S.C. § 2256.

Any of the items described in paragraphs 1 through 9 above which are stored in the form of magnetic or electronic coding on computer media or non-media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard drives, or removable hard disk cartridges, software, or memory in any form. The search procedure of the electronic data contained in computer operating software or memory devices may include the following techniques which shall be used to minimize the risk that those conducting the search will view information not within the scope of the warrant:

    a.     surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b.     "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c.     "scanning" storage areas to discover and possible recover recently deleted files;

    d.     "scanning" storage areas for deliberately hidden files; or

    e.     performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of child pornography, or other criminal activity, the further search of that particular directory, file or storage area, shall cease.